UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
CHRISTOPHE ROBERTS,                   :
                                      :
        Plaintiff,                    :
                                      :
              -v-                     :        21-cv-2559 (JSR)
                                      :
PUMA NORTH AMERICA, INC.,             :        MEMORANDUM
                                      :
        Defendants.                   :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

    Plaintiff Christophe Roberts brings this action against defendant Puma North America, Inc. ("Puma"). Roberts brings claims of trademark infringement and unfair competition under both federal law and state law, and a claim of dilution under state law. Roberts alleges that Puma willfully infringed his signature mark -- the "Roar Mark" -- by selling apparel bearing certain designs that, according to Roberts, are confusingly similar to the Roar Mark. On May 5, 2021, the Court, by bottom-line order, denied Roberts' motion for a temporary restraining order ("TRO") and preliminary injunction to prevent Puma from, among other things, using these designs in connection with the promotion, marketing, advertising, and sale of products and services. Dkt. No. 37. This memorandum explains the reasons for that ruling.

## Background

    Roberts is an artist with a following in the basketball, hip-hop, and sneaker communities. He began using the Roar Mark as his

"signature" around 2013. Roberts Decl., Dkt. No. 13, ¶ 19-22. The Roar Mark is a hand-drawn outline of sharp teeth. <u>See</u> Figure 1.



Figure 1: The Roar Mark

Roberts began selling apparel bearing the Roar Mark in 2014. <u>Id.</u> ¶¶ 23-26. He applied to the Trademark Office to register the mark in 2018, and it was registered in 2019 for t-shirts, hoodies, and jackets. <u>Id.</u> ¶¶ 32-33.

Puma is a large sportwear brand. In mid-2018, Puma began selling apparel bearing certain designs that, according to Roberts, are confusingly similar to the Roar Mark. <u>Id.</u> ¶ 40-47; <u>see also</u> Figure 2.



Figure 2: Examples of Puma's designs

In June 2019, Jay-Z, an influential hip-hop artist who serves as a brand ambassador for Puma, appeared at an NBA Finals game wearing Puma apparel bearing one of these teeth designs. Compl., Dkt. No. 1, ¶ 96. Apparently believing that Jay-Z was sporting the Roar Mark, friends and colleagues of Roberts began to congratulate him on social media for having designed a shirt worn by Jay-Z. Roberts Decl. ¶¶ 63-71.

In August 2019, Roberts retained counsel who issued a cease-and-desist letter to Puma. Id. ¶¶ 48-50. Roberts and Puma engaged in "discussions" through November 2019. Roberts Reply Decl., Dkt. No. 27, ¶ 17. Roberts understood from these discussions that "Puma did not have plans to sell merchandise using" the teeth design. Id. Around October 2020, however, Roberts encountered other teeth designs used by Puma in advertising campaigns. In March 2021, Roberts brought this lawsuit and sought a TRO and preliminary injunction soon thereafter.

## Legal Standard

"In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]." Mahmood v. Nielsen, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018).[1] To obtain

---

[1]   Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

either, a party must ordinarily show "that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest." Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015). Alternatively, a party may show "irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Id.

### Discussion

The parties dispute each of the necessary elements of a preliminary injunction. The Court finds that Roberts has not established sufficiently serious questions going to the merits to make them a fair ground for litigation, let alone a likelihood of success. The Court denies the motion on that basis.[2]

**I.   Likelihood of Success on the Merits**

**A. Trademark Infringement Claims**

---

[2]   Because the Court finds that Roberts has failed to establish serious questions going to the merits, the Court does not address the remaining factors relevant to issuance of injunctive relief, including whether Roberts has established that he would suffer irreparable harm in the absence of injunctive relief or whether the balance of the equities weighs in favor of such relief.

Roberts brings claims under § 32(1) of the Lanham Act, 15 U.S.C. § 1114, and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Although § 32(1) concerns registered marks, whereas § 43(a) concerns unregistered, common law marks, see Virgin Enters. Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003), the same analysis applies to both provisions, Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114-15 (2d Cir. 2006). That is, "[t]o prevail on a trademark infringement claim under §§ 32 and 43(a) of the Lanham Act, a plaintiff must demonstrate (1) that it has a valid mark entitled to protection and (2) that the defendant's use of it is likely to cause confusion." Chloe v. Queen Bee of Beverly Hills, LLC, No. 06-cv-3140 (RJH), 2011 WL 3678802, at *3, (S.D.N.Y. Aug. 19, 2011).

Registration of a trademark constitutes prima facie evidence of its validity. 15 U.S.C. § 1115(a). Roberts owns a registered trademark for the use of the Roar Mark on t-shirts, hoodies, and jackets. Dkt. No. 13-2. The first element is therefore satisfied.

The Court uses a multi-factor test set out in Polaroid Corp. v. Polard Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961), to evaluate the likelihood of consumer confusion. This test requires analysis of eight factors: (1) the strength of the mark; (2) the similarity of the marks; (3) the competitive proximity of the products; (4) the likelihood that the senior user will "bridge the

5

gap"; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market. Id. "No single factor is dispositive, nor is a court limited to consideration of only these factors." Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 130 (2d Cir. 2004). As a threshold matter, however, the Court must determine what types of confusion are at issue in this case.

### 1. Types of Confusion under the Lanham Act

This Circuit recognizes two basic forms of cognizable confusion under the Lanham Act: direct (or forward) and reverse confusion. Direct confusion can occur, for example, where a customer sees the defendant's goods and believes it was made by the plaintiff. Reverse confusion can occur, by contrast, where a customer sees the plaintiff's goods and believes it was made by the defendant. See Lang v. Retirement Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1981) (discussing reverse confusion).

Where direct or reverse confusion occurs, that confusion can be confusion as to source or confusion as to affiliation. Source confusion occurs where a customer is confused as to a good's source or origination. Affiliative confusion occurs where a customer is confused as to a good's affiliation or sponsorship. See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823

F.3d 153, 160 (2d Cir. 2016) ("[O]ur case law demonstrates that consumer confusion is plainly not limited to source confusion."); Dall. Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 (2d Cir. 1979) (discussing affiliative confusion). The following table provides examples of these four types of confusion, as applied to the facts of this case.

|  | Direct | Reverse |
|---|---|---|
| Source | Customer believes Puma apparel was produced by Roberts | Customer believes Roberts apparel was produced by Puma |
| Affiliative | Customer believes Puma apparel is affiliated with Roberts | Customer believes Roberts apparel is affiliated with Puma |

Any of these four types of confusion are cognizable under the Lanham Act. Roberts brings claims for both direct source confusion and direct affiliative confusion. He contends that the use of the teeth designs on the Puma apparel is likely to confuse consumers into believing that the Puma apparel was actually sold by Roberts -- an instance of direct source confusion. He also argues, to the extent that Puma's name is clearly visible on these goods, that the use of the teeth designs on the Puma apparel is likely to confuse consumers into believing that Roberts had endorsed Puma's products or that he was otherwise affiliated with Puma -- that is, direct affiliative confusion.

Roberts also suggests, less persuasively, that his claim involves reverse confusion. But Roberts does not present any evidence that Puma's use of the teeth designs is likely to confuse consumers into believing that Roberts' apparel is sold by, or otherwise affiliated with, Puma. At most, the evidence suggests that some consumers might be confused into believing that Puma's apparel is sold by, or is otherwise affiliated with, Roberts. But reverse confusion does not exist "where the consumers erroneously believe the senior user [i.e., Roberts] is the source of the junior user's product [i.e., Puma]." See Sunenblick v. Harrel, 895 F. Supp. 616, 631 (S.D.N.Y. 1995); see also Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 742 (2d Cir. 1994) (explaining that reverse confusion occurs where consumers mistake a plaintiff's products as originating with the defendant).

Accordingly, the Court will analyze whether Roberts has shown a likelihood of either or both of direct source and direct affiliative confusion.[3]

## 2. The Polaroid Factors

---

[3]   Put differently, the Court concludes that Roberts has not established a likelihood of success on the merits of any reverse confusion claim.

Review of the <u>Polaroid</u> factors indicates that Puma's use of the various teeth designs is unlikely to cause either direct source confusion or direct affiliative confusion.

### a. Strength of the Mark

A mark's "strength" is "crucial to the likelihood of confusion analysis" because a plaintiff's well-known association with the claimed mark "makes it much more likely that consumers will assume wrongly that [the plaintiff] is somehow associated with [the defendant's product] or has authorized the use of its mark." <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.</u>, 799 F.2d 867, 873 (2d Cir. 1986). Such strength depends on a mark's "inherent distinctiveness" and its "acquired distinctiveness." <u>Virgin Enters.</u>, 335 F.3d at 147. There are four categories of marks for purposes of inherent distinctiveness analysis: generic, descriptive, suggestive, and arbitrary and fanciful. <u>See Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 (2d Cir. 1976). As to the fourth category, "[a]n arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark." <u>Lane Capital Management, Inc. v. Lane Capital Management, Inc.</u>, 192 F.3d 337, 344 (2d Cir. 1999). Arbitrary and fanciful marks are considered inherently distinctive and are "automatically protected." <u>Id.</u>

The Roar Mark is arbitrary with respect to apparel and basketball and so its inherent distinctiveness is robust. Puma's counterargument -- that Roberts has failed to provide any evidence of the mark's acquired distinctiveness -- is unavailing. Only where marks are not considered inherently distinctive will courts look to the mark's acquired distinctiveness. See id. This factor weighs in favor of Roberts.

### b. Similarity of the Marks

"[I]n determining the similarity of marks in an infringement action, a court must examine the visual appearance of each mark in the context of its use." Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 735 (2d Cir. 1991). Accordingly, the Court does not consider the marks in the abstract, but instead evaluates their "overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005).

This factor is complicated by the fact that Puma employs many different teeth designs, some of which more closely resemble the Roar Mark than others. The design on the apparel worn by Jay Z, for example, appears similar to the Roar Mark. See Figure 3. Both marks feature upper and lower rows of teeth in a frontal

10

perspective, in hand drawn outline with no shadowing or depth, using a similar line weight and movement. Many designs, however, hardly resemble the Roar Mark at all. One of the jackets identified in the complaint, for example, features hand drawn outlines of rows of teeth, but the similarities stop there. The rows of teeth are not one on top of the other, as they are in the Roar Mark, but are side-to-side, adorning each pocket. See Figure 4.




Figure 3                          Figure 4

Roberts, however, seeks a preliminary injunction with respect to all of Puma's teeth designs; he does not limit his claims to those designs that more closely resemble the Roar Mark. Therefore, in evaluating this factor, the Court evaluates the similarity of

Puma's teeth designs in general, not any particular teeth design. Because Puma's challenged teeth designs come in many different shapes and sizes, it is unlikely that a consumer would believe the marks are produced by or affiliated with Roberts, who uses only a single, constant design.[4] This factor weighs against Roberts.

### c. Competitive Proximity

The competitive proximity factor "concerns whether and to what extent the two products compete with each other." Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996). In order to assess such competition, courts evaluate "the nature of the products themselves and the structure of the relevant market," by considering, among other things, the channels through which the goods are sold. Id.

---

[4]     Puma also argues that the marks are not similar because the the teeth designs are always accompanied by the word "Puma." This argument is at best only half right. While the inclusion of the word "Puma" might reduce the likelihood of direct source confusion, it increases the likelihood of direct affiliative confusion. A consumer who sees what she believes is the Roar Mark next to the word "Puma" might conclude that Roberts had somehow endorsed Puma's products. See Banff, Ltd. v. Federated Dept. Stores, Inc., 638 F. Supp. 652, 656 (S.D.N.Y. 1986) ("[U]se of a defendant's own name in conjunction with an otherwise similar mark does not generally excuse the infringement since it may instead simply increase the misappropriation by linking the defendant's own name to the plaintiff's good will established by its trademark."). Nonetheless, the Court finds that the teeth designs -- as a whole -- are not sufficiently similar to the Roar Mark to allow for direct affiliative confusion.

On the one hand, both Roberts and Puma claim to sell clothing, which weighs in favor of market proximity.[5] On the other hand, Puma alleges that it sells its apparel through its own Puma-branded stores, Puma's e-commerce website, and through retail partners, Staiger Decl., Dkt. No. 25, ¶ 28, whereas Roberts sells clothing only on his own website and, occasionally, at art installations and events, Roberts Decl. ¶ 27. The stark difference in the channels of trade does not support a finding of competitive proximity and therefore weighs against Roberts.

### d. Bridging the Gap

"The term 'bridging the gap' is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields." C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 18 (2d Cir. 1985). It thus requires evaluating the "likelihood that the prior owner will bridge the gap." Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 45 (2d Cir. 2016). Other than speculation of potential future collaborations with national brands, Roberts offers no concrete plans to begin selling his apparel bearing the Roar Mark alongside

---

[5]   In fact, at the time the complaint was filed, Roberts did not sell any apparel bearing the Roar Mark. Roberts Decl. ¶ 23. It was only following oral argument that Roberts relaunched his website store, which now sells t-shirts, facemasks, and pins bearing the Roar Mark. Roberts Supp. Mem., Dkt. No. 34, at 3.

Puma's. Roberts points out, for example, that he is a part of a "national brand spotlight" associated with a bottled water brand, Roberts Reply Decl. ¶ 27, and that he is "working with Nike to use [the] Roar Mark on a line of consumer electronics relating to sportswear," Roberts Decl. ¶ 110. Such plans to use the Roar Mark on water bottles or electronics, however, do not help Roberts bridge the gap because his trademark covers uses of the Roar Mark on certain items of apparel. Moreover, the national spotlight campaign does not appear to feature the Roar Mark at all. Instead, it appears to show other designs by Roberts, such as a lion bearing its teeth. See Dkt. No. 27-2. This factor weighs against Roberts.

### e. Actual Confusion

Evidence of actual confusion is a strong indication that a likelihood of confusion exists. See Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987). Roberts introduced evidence that some of his social media followers, certain online media, and two of his customers were confused into believing that the Puma t-shirt worn by Jay-Z was either made by or affiliated with Roberts. Confusion on the part of his social media followers is largely beside the point. See Saxon Glass Techs., Inc. v. Apple Inc., 393 F. Supp. 3d 270, 305 (W.D.N.Y. 2019) ("[T]he actual confusion inquiry focuses on the consuming public as a whole, not interested parties already familiar with

the plaintiff's mark through personal connections."). Likewise, the two confused customers were already fans of Roberts and familiar with his art before seeing the Jay-Z photograph. To the extent that any of these instances of confusion are relevant, moreover, they are relevant only with respect to the few particular teeth designs that allegedly engendered such confusion. There is, by contrast, a complete lack of evidence of any actual confusion as to the majority of Puma's teeth designs. This factor weighs against Roberts.

### f. Bad Faith

The "bad faith" inquiry "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang, 949 F.2d at 583. Roberts argues that there is evidence of bad faith because an artist who previously worked with Roberts on an art installation -- Emory Jones -- was later hired to work for Puma. See Roberts Decl. ¶¶ 34-42. Roberts also contends that the Court can infer bad faith because Puma continued to use the teeth designs after receiving a cease-and-desist letter from Roberts' counsel.

The Court disagrees. Although "[c]ourts have found bad faith where defendants have failed to comply with cease and desist letters without consulting counsel," Microban Products Co. v. API

Industries, Inc., No. 14-cv-41 (KPF), 2014 WL 1856471, at *8
(S.D.N.Y. May 8, 2014), there are no allegations that Puma failed
to consult counsel. Also, Roberts' speculation regarding Mr. Jones
is undermined by the declarations from Puma's head of basketball
operations and the creative director of the advertising agency
denying that Mr. Jones had anything to do with the creation of the
teeth designs. See Collins Decl., Dkt. No. 24, ¶¶ 24-25; Staiger
Decl., ¶¶ 38-40. The following factors, moreover, cut against a
finding of bad faith: (1) Puma conducted a trademark search, see
New York City Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F.
Supp. 2d 305, 339 (S.D.N.Y. 2010); (2) Puma's teeth designs are
consistent with Puma's well-established feline theme, see Star
Industries, Inc. v. Bacardi, & Co. Ltd., 412 F.3d 373, 388 (2d
Cir. 2005); and (3) Puma, a well-known company, would have little
reason to capitalize on Roberts' minimal commercial reputation,
see Gameologist Group, LLC v. Scientific Games Intern., Inc., 838
F. Supp. 2d 141, 163 (S.D.NY. 2011).

### g. Quality of the Products

The quality of an allegedly infringing product is potentially
relevant in two ways. If the junior user's product is of an
inferior quality, this factor will "go[] more to the harm that
confusion can cause the plaintiff's mark and reputation than to
the likelihood of confusion." Virgin Enters., 335 F.3d at 152. If,

16

by contrast, the junior user's product is of an equal quality, this factor will go more to the likelihood of confusion. Accordingly, only the latter "has relevance to determining the likelihood of confusion." Savin Corp. v. Savin Grp., 391 F.3d 439, 461 (2d Cir. 2004)

Roberts contends that Puma's "mass produced" products are of a lesser quality and therefore harm Roberts' "pricing and reputation as a high-end street wear brand." Pl. Mem., Dkt. No. 14, at 17. Roberts, however, offers no evidence that Puma's mass production necessarily means that its products are of a lower quality. In any event, even assuming Puma's products were of a lower quality, that would actually cut against confusion because buyers might be less likely to assume that Puma's mass-produced products are created by or affiliated with a high-end artist like Roberts. This factor weighs against Roberts.

### h. Sophistication of Consumer

Finally, the Court considers the sophistication of the relevant consumers. This factor looks to the "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." Star, 412 F.3d at 390. As a general rule, "the more sophisticated the purchaser, the less likely he or she will be confused by the

presence of similar marks in the marketplace." Savin, 391 F.3d at 461. In a direct confusion case, the consumers relevant to this inquiry are those who purchase the defendant's products. See Sterling, 14 F.3d at 742.

Where, as here, the parties "have not submitted any relevant expert opinions or surveys," the Court is left to rely solely on . . . indirect indications of sophistication," based "on the nature of the product or its price." Id. Puma's goods are not especially expensive; its shirts, for example, appear to retail for around $30 to $40. See Roberts Decl. ¶¶ 78, 80. This suggests Puma's consumers are unsophisticated for purposes of this analysis. But the lack of evidence on this issue militates against giving this factor too much weight. Accordingly, this factor weighs, although only lightly, in favor of Roberts.

### i. Weighing the Polaroid Factors

Having considered each of the Polaroid factors, the Court finds that Roberts has not demonstrated a likelihood of confusion. All but two of the factors either favor Puma or are neutral. Significantly, as to Puma's teeth designs as a whole, the marks are not similar, and there is little evidence of actual confusion or of bad faith. Accordingly, there is no basis to find that Puma's use of the teeth designs, as a whole, is likely to cause confusion with the Roar Mark.

18

**B. State Law Claims**

As previously noted, Roberts also brings claims for common law trademark infringement and unfair competition, and a claim for dilution under New York. Roberts has also failed to establish sufficiently serious questions going to the merits of any of these claims.

To prevail on his common law claim of trademark infringement, Roberts must again show a "likelihood of confusion as to the source or sponsorship of defendant's products," Standard & Poor's Corp., Inc., v. Commodity Exch., Inc., 683 F.2d 704, 708 (2d Cir. 1982), which is assessed under the same confusion standard applied for infringement under the Lanham Act, Katz v. Modiri, 283 F. Supp. 2d 883, 900 (S.D.N.Y. 2003). For the reasons discussed above, Roberts has failed to do so.

Similarly, to prevail on his common law unfair competition claim, Roberts must demonstrate a likelihood of confusion and Puma's bad faith. WIZKIDS/NECA, LLC v. TIII Ventures, LLC, No. 17-cv-2400 (RA), 2019 WL 1454666, at *15 (S.D.N.Y. Mar. 31, 2019). As discussed above, Roberts has failed to demonstrate either a likelihood of confusion between the marks or that Puma acted in bad faith.

Finally, to prevail on his dilution claim under New York law, Roberts must show that Puma "uses or modifies [Robert's] trademark

to identify the [Puma's] goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of [Roberts'] product." <u>Deere & Co. v. MTD Products, Inc.</u>, 41 F.3d 39, 43 (2d Cir. 1994). Courts in the Second Circuit consider six factors to determine dilution by blurring under New York law: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark. <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 114 (2d Cir. 2009). Importantly, New York does not permit a dilution claim unless the two marks are "substantially" similar. <u>Id.</u> To show "substantial similarity," Roberts must demonstrate that the teeth designs are sufficiently similar to the Roar Mark that a "substantial segment" of target consumers sees the two designs as essentially the same. <u>Miss Universe, L.P., LLLP v. Villegas</u>, 672 F. Supp. 2d 575, 595-96 (S.D.N.Y. 2009). Because, as discussed above, the teeth designs are not similar enough to the Roar Mark to infringe it, "it follows that the former is not similar enough to dilute the latter." <u>Id.</u> Therefore, Roberts has not shown a likelihood of success on the merits of his dilution claim.

## Conclusion

In sum, Roberts has failed to establish a likelihood of success on, or substantial questions going to, the merits of any of his claims. For that reason, the Court, by bottom-line order, denied Roberts' motion for a temporary restraining order and preliminary injunction.

Dated:     New York, NY
           May 27, 2021                    _____
                                           JED S. RAKOFF, U.S.D.J.